Connie L. GRETSCH, Appellant,

v.

VANTIUM CAPITAL, INC. d/b/a
Acqura Loan Services,
Respondent.

No. A12–2270.

Supreme Court of Minnesota.

April 2, 2014.

Rehearing Denied May 30, 2014.

Timothy L. Thompson, Housing Preservation Project, Saint Paul, MN; and Richard J. Fuller, and Bert Black, Schaefer Law Firm, LLC, Minneapolis, MN; and Randall Smith, Saint Paul, MN, for appellant.

Michael J. Steinlage, Paul Sand, Larson King, LLP, Saint Paul, MN, for respondent.

Prentiss Cox, University of Minnesota Law School, Minneapolis, MN, for amicus curiae University of Minnesota Law School Consumer Protection Clinic.

## OPINION

GILDEA, Chief Justice.

Connie L. Gretsch filed a lawsuit against Vantium Capital, Inc. d/b/a Acqura Loan Services ("Acqura") alleging numerous state common law and statutory claims. Gretsch's claims arise from Acqura's alleged violation of its Servicer Participation Agreement with Fannie Mae. Gretsch contends that Acqura violated the agreement by failing to follow guidelines applicable under the federal Home Affordable Modification Program. The sole issue on appeal is whether Minn.Stat. § 58.18, subd. 1 (2012), provides a private cause of action for Gretsch to pursue damages for Acqura's alleged violation of its agreement with Fannie Mae, an agreement to which Gretsch is not a party. The district court and court of appeals both held that Gretsch lacked standing. Because we conclude that Minn.Stat. § 58.18, subd. 1, provides for a private right of action and therefore gives Gretsch standing to pursue her claim, we reverse.

Before turning to the specific facts alleged here, we begin with a discussion of the statutory scheme that underlies those allegations. As part of the Emergency Economic Stabilization Act of 2008, Congress authorized the Troubled Asset Relief Program ("TARP") and the Making Home Affordable program, which includes the Home Affordable Modification Program ("HAMP"). *See* 12 U.S.C. §§ 5211, 5219 (2012). Under HAMP, non-government sponsored entities could voluntarily enter into a servicer participation agreement ("SPA") with the federal government through Fannie Mae to participate in the program and receive financial incentives

for modifying mortgages. The SPA governs the servicer's participation in HAMP for all of the servicer's mortgages. Under the SPA, the servicer is required to follow the HAMP program directives and guidelines. These directives include the requirement that the servicer consider a borrower's request for a HAMP modification and notify the borrower within 30 days of its decision and provide the specific reason for the decision. During the period in which the servicer is considering the borrower for HAMP eligibility, the servicer cannot refer the matter for foreclosure or proceed with any pending foreclosure. Dep't of Treasury, Making Homes Affordable Program, *Handbook for Servicers of Non–GSE Mortgages* 52–53 (3d ver.2010).

With this statutory scheme in mind, we turn to the specific facts alleged in this case.[1] Gretsch alleges in her complaint that she entered into a mortgage with Aegis Lending Corporation to finance the purchase of her home in 2006. Aegis later assigned the mortgage to Pacifica L. Nineteen, LLC. The right to service the mortgage was transferred to CitiMortgage. In May 2010, the servicing rights were transferred to Acqura. Before the transfer to Acqura, Acqura had entered into a SPA with Fannie Mae.[2]

Gretsch lost her job in 2008, and she received a loan extension agreement from CitiMortgage in March 2009. In April 2010, CitiMortgage notified Gretsch that she had been granted forbearance and payment restructuring under a Citi Homeowner Unemployment Assistance Forbearance agreement and that her monthly payments would be $300. After she had made 3 months of payments, Acqura, the servi-

---

1. Because of the procedural posture of this case, our recitation of the facts takes the allegations of Gretsch's amended class action complaint as true. *See, e.g., Hebert v. City of*

*Fifty Lakes,* 744 N.W.2d 226, 229 (Minn. 2008).

2. The SPA between Acqura and Fannie Mae is dated September 2, 2009.

cer as of May 2010, notified Gretsch that it would no longer accept her payments.

Gretsch alleges that she was eligible for a HAMP loan modification. Gretsch also alleges that she continued to make requests for mortgage assistance to Acqura, including a request for a HAMP loan modification, all of which were ignored or denied without notice or explanation to Gretsch. Thereafter, Gretsch alleges, Acqura allowed mortgage foreclosure proceedings to be commenced against Gretsch without performing any of the requirements under HAMP. Finally, Gretsch alleges that Acqura has not otherwise complied with the HAMP requirements.

Gretsch filed suit on July 14, 2011. Gretsch filed an amended class action complaint in January 2012, alleging violations of state consumer protection statutes including Minn.Stat. § 58.13, subd. 1(a)(5) (2012) (Count I), Negligence (Count II), and Breach of Contract (Count III).[3] Acqura filed a motion to dismiss pursuant to Minn. R. Civ. P. 12.02(e).

The district court granted Acqura's motion, in part because HAMP does not create a private right of action and because SPAs do not give rise to third party beneficiary claims. The court concluded that because there was no breach of a contract between Acqura and Gretsch, and Gretsch was not a party to the SPA allegedly breached, that Gretsch lacked standing to enforce the directives of HAMP. Gretsch appealed.

The court of appeals affirmed. *Gretsch v. Vantium Capital, Inc.*, No. A12–2270, 2013 WL 2928200 (Minn.App. June 17, 2013). The court concluded that Minn. Stat. § 58.18, subd. 1, is ambiguous because it does not "specifically state that only a party to a written agreement has

the right to bring a private action," making it possible to interpret the statute to confer standing on an injured borrower or to confer standing only on a borrower whose contract was breached. *Gretsch*, No. A12–2270, 2013 WL 2928200, at *3. The court construed the statute as allowing a private right of action only for those borrowers who are themselves parties to the agreements that were allegedly breached. Because HAMP provides no private right of action and because Gretsch was not a party or an intended beneficiary of the SPA, the court concluded that Minn.Stat. § 58.18, subd. 1, provides no private cause of action to Gretsch and that she therefore lacks standing. *Gretsch*, No. A12–2270, 2013 WL 2928200, at *4. We granted Gretsch's petition for review.

On appeal to our court, Gretsch argues that she has standing under Minn. Stat. § 58.18, subd. 1, to pursue her claim that Acqura did not meet its obligations under the SPA. Acqura disagrees and contends that Gretsch does not have standing to pursue her claim that Acqura violated the SPA. Acqura also argues that if Minn. Stat. § 58.18, subd. 1, gives Gretsch standing, federal law preempts the state law. Finally, Acqura argues that if we construe Minn.Stat. § 58.18 to provide Gretsch with a cause of action, the statute is unconstitutional. Whether a statute provides a private right of action and confers standing is a legal question we review de novo. *See In re Custody of D.T.R.*, 796 N.W.2d 509, 512 (Minn.2011); *Zurich Am. Ins. Co. v. Bjelland*, 710 N.W.2d 64, 68 (Minn.2006). Whether federal law preempts state law and whether Minn.Stat. § 58.18 violates the constitution are also questions that we review de novo. *State v. Castillo–Alvarez*, 836 N.W.2d 527, 534 (Minn.2013) (reviewing constitutional question de novo); *Mar-*

---

3. Because Gretsch sought review only on her claim under Minn.Stat. §§ 58.13, subd.

1(a)(5), and 58.18, subd. 1, we do not address her other claims.

*tin ex rel. Hoff v. City of Rochester*, 642 N.W.2d 1, 9 (Minn.2002) (reviewing federal preemption question de novo). Finally, in reviewing the district court's dismissal of the complaint, we consider "only the facts alleged in the complaint, accepting those facts as true and must construe all reasonable inferences in favor of the nonmoving party." *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 831 (Minn.2011) (citation omitted) (internal quotation marks omitted).[4]

## I.

■ We turn first to the question of whether Gretsch has standing to sue Acqura for breach of the SPA between Acqura and Fannie Mae. A plaintiff may have standing in two ways: "either the plaintiff has suffered some 'injury-in-fact' or the plaintiff is the beneficiary of some legislative enactment granting standing." *Enright v. Lehmann*, 735 N.W.2d 326, 329 (Minn.2007) (citing *Snyder's Drug Stores, Inc. v. Minn. State Bd. of Pharmacy*, 301 Minn. 28, 31–32, 221 N.W.2d 162, 165 (1974)). The parties agree that Gretsch has standing only if the Legislature provided her with a private right of action in Minn.Stat. § 58.18, subd. 1.[5]

Gretsch contends that she has standing under Minn.Stat. § 58.18, subd. 1, to pursue her claim against Acqura for Acqura's alleged breach of the SPA. Acqura disagrees and argues that the statute does not provide Gretsch with a cause of action for breach of the SPA. We agree with Gretsch.

## A.

■ Minnesota Statutes § 58.18, subd. 1, provides: "A borrower injured by a violation of the standards, duties, prohibitions, or requirements of section[ ] 58.13 ... shall have a private right of action...." In other words, section 58.18 gives borrowers a private right of action to sue for violations of section 58.13. So, if Gretsch alleges a violation of section 58.13, the plain language of section 58.18 gives her standing to pursue that claim.

Gretsch alleges that Acqura violated section 58.13. Specifically, it is a violation of Minn.Stat. § 58.13, subd. 1(a)(5), for a servicer to "fail to perform in conformance with its written agreements with borrowers, investors, other licensees, or exempt persons." Gretsch is a borrower who alleges that Acqura, a servicer, breached its written agreement with an exempt person by failing to follow the HAMP guidelines, in violation of Minn.Stat. § 58.13, subd. 1(a)(5), resulting in the premature foreclosure of her home and injury to her. Because Gretsch alleges that Acqura violated section 58.13, Gretsch's claim falls within

**4.** The district court converted Acqura's motion to dismiss to a motion for summary judgment because the court received affidavit evidence in connection with the motion. Any documents necessary to resolve the issue on appeal, however, were referenced in the complaint. Accordingly, as Acqura conceded during oral argument, the standard of review for a motion to dismiss is the appropriate standard of review on appeal. *N. States Power Co. v. Minn. Metro. Council*, 684 N.W.2d 485, 490–91 (Minn.2004).

**5.** The lower courts held, and Gretsch does not dispute, that Gretsch would not have standing in the absence of a statutory cause of action because she is not a party or an intended beneficiary of the SPA. *See Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 832 (Minn.2012). Most courts that have addressed this issue have held that borrowers are not intended third party beneficiaries of SPAs like the one at issue here. *See McInroy v. BAC Home Loan Servicing, LP*, No. CIV. 10–4342 DSD/SER, 2011 WL 1770947, at *3 (D.Minn. May 9, 2011) (listing numerous cases finding that borrowers were not intended third party beneficiaries). Under the reasoning of these cases, Gretsch would not have a claim at common law.

the plain language of section 58.18, subdivision 1.

But, Acqura argues, section 58.18, subdivision 1, must be construed to harmonize with existing common law absent a clear and manifest intent by the Legislature to abrogate the common law. Because Gretsch could not sue under the common law for breach of a contract to which she is not a party, Acqura argues she likewise cannot sue under the statute. Acqura supports this argument with cases in which we have said that "statutes creating new causes of action do not abrogate the common law unless they do so 'by express wording or necessary implication.'" *Urban v. Am. Legion Dep't of Minn.*, 723 N.W.2d 1, 5 (Minn.2006) (quoting *Shaw Acquisition Co. v. Bank of Elk River*, 639 N.W.2d 873, 877 (Minn.2002)). Because section 58.18, subdivision 1, does not expressly state that it abrogates the common law, Acqura argues, the statute must be construed in accordance with the common law and therefore Gretsch lacks standing.[6]

It is true, as Acqura argues, that Minn. Stat. § 58.18, subd. 1, does not expressly state that the statute is abrogating the common law; but that is the necessary implication of the words used in the statute. *See Urban*, 723 N.W.2d at 4–6 (Minn. 2006) (concluding that because the Legislature had clearly stated that "licensees" were responsible under the Civil Damages Act, it impliedly did not intend for the common law doctrine of respondeat superior to apply to CDA liability). In subdivi-

sion 1, the Legislature provides that borrowers may sue servicers for violations of the "requirements of section[ ] 58.13." One of the "requirements of section[ ] 58.13" is that servicers comply with their "written agreements with borrowers, investors, other licensees, or exempt persons." Minn.Stat. § 58.13, subd. 1(a)(5). Gretsch alleges that Acqura failed to satisfy this requirement because Acqura did not comply with the written agreement it had with an exempt person (i.e., Fannie Mae). Under the statutory scheme, Gretsch has standing to sue for Acqura's noncompliance with agreements between Gretsch and Acqura; but she also has standing to sue for Acqura's noncompliance with agreements between Acqura and others. The necessary implication of giving a private right of action to a third party to a contract, like Gretsch, is that such third parties have standing to bring a lawsuit. By giving the borrower this new cause of action, the Legislature, to the extent necessary, abrogated the common law regarding third party standing.

Acqura next argues that interpreting Minn.Stat. § 58.18, subd. 1, to provide Gretsch with a cause of action would lead to absurd results because it would open the door to "unlimited and disruptive litigation by parties with no relationship to the myriad agreements that servicers have with other entities." The rule of construction that Acqura cites, however, is "not available to override the plain language of

---

**6.** The court of appeals found Minn.Stat. § 58.18, subd. 1 ambiguous but did so summarily. The court reasoned that the statute was ambiguous because it would be "possible to interpret the statute to confer standing on an injured borrower or to confer standing only on a borrower whose contract with a mortgage servicer is breached." *Gretsch v. Vantium Capital, Inc.*, No. A12–2270, 2013 WL 2928200, at *3 (Minn.App. June 17, 2013). We disagree with the court of appeals

that Minn.Stat. § 58.18, subd. 1, is ambiguous. The only way to read the statute as not providing standing to a borrower such as Gretsch is to ignore the words the Legislature used in the statute and we are not at liberty to do that. *See State v. Rick*, 835 N.W.2d 478, 482 (Minn.2013) ("If the Legislature's intent is clear from the statute's plain and unambiguous language, then we interpret the statute according to its plain meaning without resorting to the canons of statutory construction.").

a clear and unambiguous statute, except in an exceedingly rare case in which the plain meaning of the statute utterly confounds the clear legislative purpose of the statute." *Schatz v. Interfaith Care Ctr.,* 811 N.W.2d 643, 651 (Minn.2012) (citation omitted) (internal quotation marks omitted). This is not that rare case. Minnesota Statutes § 58.18, subd. 1, requires that the borrower be "injured" by a violation of an agreement in order for a borrower to bring suit and the statute does not impose any duties on servicers beyond what already exist in the written agreements the servicers signed. Following the plain language of the statute to permit these claims does not confound the Legislature's purpose or lead to an absurd result.[7]

Finally, Acqura argues that the subsequent enactment of Minn.Stat. § 582.043 (Supp.2013), which includes a private right of action for a borrower to enjoin or set aside a foreclosure sale based on a violation of mitigation requirements, suggests that Minn.Stat. § 58.18, subd. 1, does not provide a private right of action for HAMP violations.[8] Acqura's argument fails for two reasons. First, Minn.Stat. § 582.043 provides only for an injunction or the setting aside of a foreclosure sale, not damages or other remedies. Any suggestion that the remedies provided by the two statutes are duplicative therefore fails. Second, the mere fact that the Legislature

created a new cause of action does not mean that all other statutory causes of action are extinguished. In fact, Minn. Stat. § 58.18, subd. 3, specifically states that the remedies provided in subdivision 1 are meant to be cumulative with other remedies and do not restrict any other right or remedy available to the borrower. That the Legislature enacted Minn.Stat. § 582.043 therefore does not affect whether Gretsch has a claim under Minn.Stat. § 58.18, subd. 1.

### B.

In the alternative, Acqura argues that even if Minn.Stat. § 58.18, subd. 1, provides standing to nonparties to contracts to sue for breach of contract, the provision does not apply in this case for two reasons. First, Acqura argues that Minn.Stat. § 58.13 applies only to servicers and that it was not acting as a servicer, as defined by the statute, when it entered into the SPA. Second, Acqura argues that Minn.Stat. § 58.13 does not cover its SPA because the SPA is not a contract with an "exempt person." For either or both of these reasons, Acqura argues that Gretsch does not have standing under Minn.Stat. § 58.18 because she is not suing to enforce something that Minn.Stat. § 58.13 covers.

■ Turning first to Acqura's argument that it is not a "servicer" for purposes of

---

**7.** Acqura also argues that the legislative history supports its proposition that Minn.Stat. § 58.18, subd. 1, does not confer standing in this situation. But when the language of a statute is unambiguous, the clearly expressed intent must be given effect and there is no room for the canons of statutory construction. *State v. Rick,* 835 N.W.2d 478, 482 (Minn. 2013).

**8.** Acqura also argues that the statutory damages listed as recoverable under Minn.Stat. § 58.18, subd. 1, do not have any relationship to violations of SPAs. Acqura argues that this is strong evidence that the Legislature's intent

was to provide a cause of action for those harmed only by predatory lending, not servicing. But the statute clearly prohibits any "person acting as a residential mortgage ... servicer [from] fail[ing] to perform in conformance with its written agreements with ... exempt persons," Minn.Stat. § 58.13(a)(5), and section 58.18, subdivision 1, provides a right of action to any "borrower injured by a violation of the ... prohibitions ... of section 58.13." Moreover, damages available for a violation are a separate issue from standing to bring a claim.

Minn.Stat. § 58.13, the statute defines a "residential mortgage servicer" as "a person who engages in the activity of servicing a residential mortgage as defined in subdivision 22." Minn.Stat. § 58.02, subd. 20 (2012). And the activities of "servicing" include "the collection or remittance of, or the right or obligation to collect or remit for a lender, mortgagee, note owner, noteholder, or for a person's own account, payments, interest, principal, and escrow items such as insurance and taxes for property subject to a residential mortgage loan." *Id.*, subd. 22 (2012). The record does not support Acqura's contention that, as a matter of law, it is not a servicer as defined in the statute. Specifically, the SPA refers to Acqura as "Servicer" and contemplates Acqura meeting the obligations in the contract for all mortgages Acqura services. Gretsch also alleges that Acqura was a "mortgage servicer" in her complaint, and she refers to Acqura acting as a servicer or being a servicer throughout her amended complaint. In light of the statutory definitions, the provisions in the SPA, and Gretsch's allegations in her amended complaint, we cannot conclude as a matter of law that Acqura was not a "servicer" for purposes of Minn.Stat. § 58.13, subd. 1(a)(5).[9]

■ We turn next to Acqura's argument that the SPA is not a contract with an "exempt person." The complaint alleges that Acqura "enter[ed] into a [SPA] with the federal government." Acqura argues, however, that an "exempt person" for purposes of Minnesota Stat. § 58.13, subd. 1(a)(5), "has a meaning distinct from the term 'governmental agency.'" Minn. Stat. § 5802, subd. 9 (2012), defines "exempt person" as "a person exempt from residential mortgage service licensing requirements." And Minn. Stat. § 58.04, subd. 2(b)(5) (2012), clearly states that an "agency of the federal government" is exempt from residential mortgage servicer licensing requirements. Given this statutory text and the record before us, we cannot conclude as a matter of law that the SPA is not a contract with an "exempt person."[10]

In conclusion, we hold that the plain language of Minn.Stat. § 58.18, subd. 1, gives Gretsch standing to pursue her claim that Acqura violated the SPA.

## II.

■ We turn next to Acqura's argument that HAMP preempts Gretsch's state cause of action. Specifically, Acqura argues that because HAMP provides no private cause of action for its enforcement, any state law remedies to enforce HAMP are barred. Acqura's argument is not persuasive.

■ Congressional purpose is the ultimate touchstone of the preemption in-

9. In concluding that the complaint contains sufficient factual allegations to survive a motion to dismiss, we do not intend to suggest how such a claim should be resolved on the merits.

10. Acqura also argues that there are instances in which the term "exempt persons" appears in the statute where it is clear that the term does not or should not include "government agencies." Specifically, Acqura cites to Minn.Stat. § 58.13, subd. 1(a)(21), which refers only to government agencies. Based on the definition in paragraph 21, Acqura argues that the government cannot be an exempt person, because the Legislature specifically lists the government in the definition if the definition is meant to apply to the government. Acqura's argument is not persuasive. Paragraph 21 prohibits behavior "that create[s] the impression ... that a ... person is a governmental agency." The Legislature's effort to protect government initiatives in paragraph 21 does not somehow affect the generally applicable definition of "exempt person" provided elsewhere in the statute.

quiry. *Wyeth v. Levine,* 555 U.S. 555, 565, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009); *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). In all preemption cases, and particularly those in which Congress has legislated in a field that the states have traditionally occupied, we start with the assumption that the historic police powers of the states were not superseded by the federal act unless that was the clear and manifest purpose of Congress. *Wyeth,* 555 U.S. at 565, 129 S.Ct. 1187. We have also recognized that preemption is generally disfavored. *In re Estate of Barg,* 752 N.W.2d 52, 63 (Minn.2008).

 Congress can preempt a state law in several different ways. Congress may do so by using express language. *See Cipollone v. Liggett Grp., Inc.,* 505 U.S. 504, 516–17, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). Congress may also preempt a state statute by fully occupying the field; a court may infer that Congress did so where the "scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress left no room for supplementary state regulation." *Barg,* 752 N.W.2d at 63 (internal quotation marks omitted); *see also Cipollone,* 505 U.S. at 516–17, 112 S.Ct. 2608. Lastly, under what is called implied conflict preemption, federal law preempts state law either because it is impossible for a private party to comply with both the state and federal requirements, or because the state law stands as an obstacle to the accomplishment and execution of the purpose and objective of Congress. *See Wyeth,* 555 U.S. at 573, 129 S.Ct. 1187; *Barg,* 752 N.W.2d at 63–64.

In this case, Acqura raises no issue regarding express or field preemption. Instead, Acqura asserts implied conflict preemption. Specifically, Acqura argues that Minn.Stat. § 58.18, subd. 1, poses an obstacle to the federal objective of increasing servicer participation and lowering foreclosure rates because allowing a private right of action to borrowers such as Gretsch would "have a chilling effect on servicer participation due to fear of exposure to private lawsuits."

We disagree that chilled servicer participation presents an obstacle sufficient to infer that Congress intended to preempt Minn.Stat. § 58.18, subd. 1. Under the terms of the SPA, servicers who violate their SPAs are already open to suit for breach by the other contracting parties. Minnesota Statutes § 58.18, subd. 1, does not impose any obligations on servicers beyond those that contracting parties can enforce and it does not require that servicers do more than what they have already undertaken in their written agreements. Because the state law does not impose additional duties on servicers or obligations inconsistent with those set forth in HAMP or the SPA, state law cannot be said to frustrate congressional purposes in such a way as to provide a basis to conclude that Congress preempted state law. *See Wigod v. Wells Fargo Bank, N.A.,* 673 F.3d 547, 579 (7th Cir.2012) (rejecting implied preemption argument because plaintiff's state law claims "would [not] impose on [the servicer] any duties that go beyond its existing obligations under HAMP").

In urging us to reach the contrary conclusion, Acqura cites *Buckman Co. v. Plaintiffs' Legal Committee,* 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001). Acqura argues that *Buckman* compels the conclusion that Minn.Stat. § 58.18, subd. 1, is preempted. We disagree.

In *Buckman,* the plaintiffs were seeking a remedy for what they claimed was fraud upon the Food and Drug Administration. *Id.* at 343, 121 S.Ct. 1012. The Supreme Court held that such claims were preempted by the Federal Food, Drug, and Cosmetic Act. *Id.* at 344, 121 S.Ct. 1012. The Court noted that fraud upon a federal

agency is inherently federal in character and there were numerous requirements and provisions in the federal statutory scheme aimed at "detecting, deterring, and punishing false statements." *Id.* at 347–49, 121 S.Ct. 1012. Because state law fraud claims "inevitably conflict with the FDA's responsibility to police fraud consistently with the Administration's judgment and objectives," federal law preempted state law. *Id.* at 350, 121 S.Ct. 1012. In addition, "complying with the FDA's detailed regulatory regime in the shadow of 50 States' tort regimes will dramatically increase the burdens facing potential applicants—burdens not contemplated by Congress in enacting the" federal legislation. *Id.* at 350, 121 S.Ct. 1012. Finally, the court concluded that it had "clear evidence that Congress intended" that the statutory scheme at issue would "be enforced exclusively by the Federal Government." *Id.* at 352, 121 S.Ct. 1012. *Buckman* does not support Acqura's argument that federal law preempts state law.

Unlike *Buckman,* this case does not involve fraud on a federal agency. And unlike the statutory scheme at issue in *Buckman,* there is no basis to conclude that complying with state law in this case would frustrate congressional purposes in enacting federal legislation. Indeed, the HAMP regulations specifically require that programs be implemented in compliance with state common law and statutes. Treas. Supp. Dir. 09–01 at 12 (Apr. 6, 2009). The Secretary of the Treasury also expressly instructed mortgage servicers to comply with state laws when the Secretary promulgated administrative guidance for the HAMP program. Dep't of Treasury, Making Home Affordable Program, *Handbook for Servicers of Non–GSE Mortgages* 86 (3d ver.2010).[11] As the Seventh Circuit

noted, these provisions would be "odd" if in fact "Treasury had anticipated that HAMP would preempt state-law claims, especially ones that mirror its own directives." *Wigod,* 673 F.3d at 580.

Finally, with respect to preemption, Acqura argues that because HAMP did not provide a private remedy, there may not be any state remedy, because it would be an "end-run" around Congress's decision not to provide a federal cause of action. Both the district court and the court of appeals relied on the fact that HAMP did not provide a private cause of action in concluding that the state law claim failed. But the issue here is not whether there is a federal private right of action. Instead, the issue is whether federal law displaces remedies otherwise available. *See Wigod,* 673 F.3d at 581. Congress, by not providing a federal remedy, could have determined that widely available state causes of action provide appropriate relief for injured borrowers. *See Wyeth,* 555 U.S. at 574, 129 S.Ct. 1187; *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 448, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005) ("[A]lthough [the federal act] does not provide a federal remedy to farmers and others who are injured as a result of a manufacturer's violation of [the act's] labeling requirements, nothing [in the statute] precludes States from providing such a remedy."); *Olivares v. PNC Bank,* Civ. No. 11–1626 ADM/JJK, 2011 WL 4860167, at *5 (D.Minn. Oct. 13, 2011) (finding that the mere fact that the plaintiff's "claims arise from a fact pattern implicating HAMP does not preclude them from asserting claims premised upon the common law and statutory law of Minnesota. HAMP does not preempt those claims."). The absence of a federal remedy does not support the conclusion that HAMP preempts the pri-

---

11. Acqura's SPA itself clearly states that all services will be performed in compliance with all applicable federal, state, and local law.

vate right of action provided for in Minn. Stat. § 58.18, subd. 1.

For all of these reasons, we hold that federal law does not preempt Gretsch's state law cause of action.

## III.

 Finally, we turn to Acqura's argument that Minn.Stat. § 58.18, subd. 1, if read to give Gretsch a private right of action, would violate the Contracts Clause of both the United States Constitution and the Minnesota Constitution, which both prohibit state laws impairing the obligation of contracts. U.S. Const. art. I, § 10, cl. 1; Minn. Const. art. I, § 11. A law impairs the obligations of a contract when it renders those obligations invalid or releases or extinguishes them. *Home Bldg. & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 431, 54 S.Ct. 231, 78 L.Ed. 413 (1934). The contracts clauses prevent retroactive impairment of contracts. When the statute was in force and effect at the time the contract was made, there is no impairment, because existing statutes are read into future contracts and enter into the contract terms by implication. *W. States Utils. Co. v. City of Waseca,* 242 Minn. 302, 312, 65 N.W.2d 255, 263 (1954) ("[C]ontracts are made in submission to existing legislation.") (citation omitted). Minnesota Statutes § 58.18, subd. 1, went into effect on August 1, 2007, and the SPA was not entered into until September 2009. We therefore hold that Minn.Stat. § 58.18, subd. 1, does not violate the Contracts Clause of the United States Constitution or the Minnesota Constitution.

Reversed and remanded.

STRAS, J., took no part in the consideration or decision of this case.